IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

HAROLD FISH,

      Plaintiff,

v.                             CASE NO. 5:14-cv-143-RS-GRJ

TIM BROWN, in his official capacity
as SHERIFF for HOLMES COUNTY,
FLORIDA, TYLER HARRISON,
individually, and TOM LOUCKS,
individually,

      Defendants.
_____/

## ORDER

Before me are the Motion for Summary Judgment of Defendants (Doc. 40),

Plaintiff's Response and Memorandum in Opposition (Doc. 47), and Plaintiff's

Response to Defendants' Statement of Facts (Doc. 48).

Harold Fish sued Officers Tyler Harrison and Tom Loucks, as well as

Holmes County Sheriff Tim Brown, for unconstitutional warrantless entry,

unconstitutional false arrest, and various state law claims. Officers Harrison and

Loucks entered Fish's home when they accompanied Fish's ex-girlfriend there to

keep the peace as she retrieved belongings she left at the house. Inside, the officers

found a number of firearms, and arrested Fish for violating an injunction against

him which prohibited him from possessing firearms. Fish claims that the officers

1

never had permission to enter his house, did not have permission to go so far into his house that they could see the guns, and did not have probable cause to arrest him for having the guns in his house.

After review, I find as a matter of law that the officers are entitled to qualified immunity from suit. The officers' motion for summary judgment is therefore granted as to the federal law claims, and the state law claims are remanded for further proceedings.

## I.   STANDARD OF REVIEW

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store,*

*Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).  However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## II.   <u>BACKGROUND</u>

I accept the facts in the light most favorable to Plaintiff.  *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008).  All reasonable doubts about the facts shall be resolved in favor of the non-movant.  *Id.*

Plaintiff Harold Fish ended his relationship with his girlfriend, Margo Riesco, in late 2010. (Doc. 48 at 8). However, she had left some of her personal belongings at Fish's house in Bonifay, Florida. (*Id.*).

On April 20, 2011, Riesco called Fish to let him know that she was going to come by his house to pick up her things. (*Id.* at 9). She showed up at his house that day accompanied by two police officers—Defendants Tyler Harrison and Tom Loucks. (*Id.* at 11). Riesco had called the police before coming to Fish's house and asked for an escort because she feared some sort of dispute. (Doc. 40 at 4). The facts are unclear as to exactly what Riesco told the officers before she drove to

Fish's house; she at least told the officers that she feared for her safety during the encounter and that Fish had guns in his home. (Doc. 40 at 4; Doc. 48 at 9-10).

Fish's house had a back door that opened into an attached "sunroom"; the sunroom was an enclosed, furnished patio area that had its own lockable door to the outside. (Doc. 48 at 8-9). When Riesco and the officers arrived, Riesco opened the door (which was unlocked) to the sunroom, walked through the sunroom, and knocked on the back door. (Video at 2:02).[1] Fish answered the back door as the officers waited outside and made their way into the sunroom. (Video at 2:05). Riesco muttered something, then said "I'm here." (Video at 2:10). The two officers were clearly visible to Fish when he opened the back door. (Doc. 48 at 11). After a brief, unintelligible exchange between Fish and the officers, Riesco said "I brought them to watch so I don't steal nothing of yours." (Video at 2:15). Fish responded, "alright." (Video at 2:15).

The officers then followed Riesco into the house. (Doc. 48 at 12). Officer Harrison asked Fish if he was "doing alright," and Fish replied "I'm good." (*Id.*; Video at 2:20). Several seconds later, Officer Harrison asked "what all she got here," inquiring about Riesco's belongings, and Fish responded "it's all in that drawer in there," referring to the bedroom. (Video at 2:30; Doc. 48 at 12). The

---

[1] Plaintiff's Exhibit 8, filed with the court as a file on a DVD-ROM, contains the video and audio recording of the April 20, 2011, incident from Officer Harrison's in-car camera. Although the video footage is largely obscured after the officers enter the sunroom, audio recording remains throughout the incident.

parties dispute how forceful the officers were about entering the home, and whether they had received either explicit or tacit permission from Fish to follow Riesco in and to go as far as the bedroom. (Doc. 48 at 12). However, it is undisputed that after about one minute of searching, Officer Harrison asks "you still got that injunction against you?" (Video at 3:00).

At the time, there was a domestic violence injunction against Fish that, among other things, prevented him from owning firearms. (Doc. 40 at 6; Doc. 48 at 7). Officer Harrison knew of the injunction at the time he arrived at Fish's house. (Doc. 48 at 10). The facts are disputed as to how exactly Harrison found out about the injunction and the extent to which he investigated and verified the existence of the injunction. (*Id.*). There is some evidence that Riesco told Harrison about the injunction and that he did not investigate its existence further, (Doc. 48 at 10), while Harrison claims he was informed about the injunction by his supervisor, (Doc. 40 at 6).

After Officer Harrison clarified the inquiry about the no-firearms injunction, Fish immediately responded "those aren't mine!" and claimed that they belonged to his son, Jared, who occasionally lived at the house with him. (Video at 3:10; Doc. 48 at 8). Harrison noted that multiple guns were "out in the open." (Video at 3:15). Fish claims, however, that only one gun, a holstered revolver, was openly visible. (Doc. 48 at 12).

After some more exchanges about the guns, and over Fish's vehement protests, Harrison proceeded to arrest and handcuff Fish in his own home. (Video at 3:30; Doc. 12 at 16).

The officers brought Fish out to a patrol car and arrested him on charges of violation of an injunction and resisting arrest without violence. (Doc. 48 at 13). In the ensuing criminal proceedings, a county court judge granted Fish's motion to suppress and dismissed the charges against him. (Doc. 40 at 19).[2]

Fish filed suit in state court against Officers Harrison and Loucks in their individual capacities, as well as Defendant Holmes County Sheriff Tim Brown in his official capacity. (*See* Doc. 1-2). Fish alleged common law false arrest and imprisonment against all defendants (Counts I and II), common law malicious prosecution against Harrison and Loucks (Count III), and violations of his Fourth Amendment rights under 42 U.S.C. § 1983 by Harrison and Loucks (Count IV). (Fish voluntary dismissed a § 1983 claim against Brown. (*See* Doc. 9).)

Defendants properly removed to this court. The defendants now move for summary judgment on all counts.

---

[2] The parties do not seriously dispute that this ruling has no preclusive effect on this litigation. Fish's only argument that the state court ruling should be considered, (Doc. 47 at 12), is not comprehensible and contains no citations to authorities to support it.

## III.   <u>DISCUSSION</u>

Because jurisdiction in this case is based on Fish's federal law claims, I address those claims first.

### a.      *Federal Law § 1983 Claims*

Fish claims that Officers Harrison and Loucks violated his Fourth Amendment rights. Specifically, Fish argues that Harrison and Loucks violated his right to be free from unreasonable searches and seizures by both entering his home without permission and by arresting him without probable cause.

I note at the outset that even if the officers violated Fish's constitutional rights, they may still be entitled to qualified immunity from suit. Qualified immunity is a shield against liability for government actors, prohibiting civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).  Qualified immunity allows government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).   It is an immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 512, 105 S. Ct. 2806, 2808, 86 L. Ed. 2d 411 (1985).

To receive qualified immunity, the defendant public official must prove as a threshold matter that he or she was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Courson v. McMillan,* 939 F.2d 1479 (11th Cir. 1991) (quoting *Rich v. Dollar,* 841 F.2d 1558, 1563-64 (11th Cir. 1988)). Once this is established, the burden shifts to the plaintiff. *Id.* The court then engages in a two-step inquiry. *Hadley*, 526 F.3d at 1329. The first question is whether, taken in the light most favorable to the plaintiff, the facts alleged show that the defendants' conduct violated a constitutional or statutory right. *Id.* If so, the second question is whether the right, be it constitutional or statutory, was clearly established. *Id.*

### 1.   Illegal Entry

Fish claims that the officers illegally entered his home without permission, and proceeded without permission into the bedroom where the guns were found. The Officers argue that they had permission to enter.

It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980) (citations omitted). This basic principle is founded on the very core of the Fourth Amendment: the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d

1323, 1327 (11th Cir. 2006) (citations and quotations omitted). The Fourth Amendment draws a firm line at the entrance to the house; that threshold may not reasonably be crossed without a warrant. *Payton*, 445 U.S. at 590.

However, the prohibition on warrantless entry of a person's home does not apply to situations in which voluntary consent has been obtained from the individual whose property is searched. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797, 111 L. Ed. 2d 148 (1990). A person does not consent to a search of his residence when his consent to the entry into his residence is prompted by a show of official authority. *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002).

Fish argues vehemently and repeatedly that he never gave the officers permission to enter the home, either implicit or explicit. However, this claim is belied by the uncontroverted video and audio recording of the event. After knocking on the door, Riesco said to Fish "I brought [the officers] to watch so I don't steal nothing of yours," to which Fish responded, "alright." (Video at 2:15). By responding affirmatively to Riesco's introduction of the officers, Fish gave what any reasonable person would have considered explicit verbal consent for the officers to enter his home.

*A.    The Entry to the Sunroom*

There is one wrinkle, however, in Fish's consent. Prior to his giving consent by saying "alright," both officers had already followed Riesco into the sunroom. (Video at 2:15). More specifically, Riesco entered the sunroom boldly and confidently from the lawn through the unlocked glass door. She proceeded through the sunroom to knock on the back door, between the sunroom and the rest of the house. (Video at 2:03). Officer Harrison crossed over the doorway threshold from the outside lawn into the sunroom even before Fish opened the back door. (Video at 2:07). Officer Loucks subsequently entered the sunroom after Fish had opened the door and said something unintelligible, but before he had said "alright" to their presence. (Video at 2:10).

Fish argues that the sunroom was part of the house, and that the door of the sunroom was the threshold into the house at which the Fourth Amendment's protections began. If so, he says, then the officers entered the house without permission and thus violated Fish's constitutional rights.

The officers respond that the sunroom—which they describe as a "porch"— was merely "curtilage," and they did not need his permission to enter.  Police officers can enter onto residential property, including portions that would be considered part of the curtilage, in order to carry out legitimate police business. *Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011). Places "where the public

would be expected to go"—such as porches, walkways, and entryways to door of a home—are considered curtilage outside the protections of the Fourth Amendment. *Id.* However, what constitutes curtilage is a question of fact to be determined by the jury. *United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983).

Because the sunroom was furnished and fully enclosed by a lockable door (although that door happened to be unlocked), there is a triable issue of fact as to whether the sunroom was part of the house or curtilage. (For a clear view of the sunroom's exterior, *see* Doc. 41-3 at 16). I cannot say that no reasonable juror would find the sunroom—which had wood and brick walls, had blinds in all the windows except the door itself, and was furnished with indoor furniture and a television—would find that the sunroom was an area "where the public would be expected to go." In fact, it seems highly unlikely that Fish would expect the public to go into a fully enclosed, lockable room where he keeps a television. As I must draw factual inferences in favor of the plaintiff, I must proceed by assuming that the sunroom was not a place where the public would be expected to go, and therefore was not curtilage.

However, I need not decide whether the officers violated Fish's constitutional rights by crossing into the sunroom before he had given explicit permission. The officers, in entering the sunroom, were at least entitled to qualified immunity.

As previously mentioned, an official sued under § 1983 is entitled to qualified immunity unless the official violated a constitutional right that was clearly established at the time of the challenged conduct. *Carroll v. Carman*, 135 S. Ct. 348, 350, 190 L. Ed. 2d 311 (2014). Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions and it protects all but the plainly incompetent or those who knowingly violate the law. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011) (quotations omitted).

The unique facts of this case gave the officers "breathing room" as to the constitutionality of their conduct of crossing the threshold of the sunroom before Fish gave them explicit permission to enter the home. The officers, although acting in their official capacity, were at Fish's residence for the stated purpose of keeping the peace and making sure there were no incidents as Riesco returned to her ex-boyfriend's home to recover her things. Riesco was familiar with the property, and that day had received permission to come to the house to take back her possessions. She entered the same way she, as a frequent visitor, had always entered the house—through the sunroom. She confidently walked through the unlocked glass door to the sunroom, and without hesitation approached the back door of the house and knocked.

Here, the officers are entitled to qualified immunity for two reasons. First, the law is not settled as to whether, and to what extent, the officers had consent stemming from Riesco's permission to enter the sunroom. Riesco, who was accustomed to using the unlocked sunroom as her primary means of entering the house, believed that she had permission (based on her prior interactions and Fish's consent by telephone that she would be arriving soon) to enter the sunroom for the purpose of knocking on the back door.[3] The Supreme Court has specifically noted that the law is not settled for the purposes of qualified immunity in situations in which officers argue that they had consent to enter a home based on a "consent-once-removed" theory in which consent accrues to the officers after the owner gives consent to a private citizen acting as a confidential informant. *See Pearson v. Callahan*, 555 U.S. 223, 244, 129 S. Ct. 808, 823, 172 L. Ed. 2d 565 (2009). The Eleventh Circuit does not appear to have subsequently addressed the issue, so binding precedent exists on whether or not the officers might have been justified in having "consent-once-removed" from Riesco's consent. *See Pearson*, 555 U.S. at 244 ("The officers here were entitled to rely on these cases, even though their own Federal Circuit had not yet ruled on 'consent-once-removed' entries.").

---

[3] *See* Riesco Deposition, Doc. 41-4 at 22 ("Q: So in order to let the person inside the home know that you're there, you would open the sunroom door, go into the sunroom and then knock on that? A: Yes.")

Moreover, because this case did not involve a confidential informant but rather a private citizen in her personal capacity being accompanied by police officers for peacekeeping purposes, the law is even less clearly established. There is at least a colorable argument that the "consent-once-removed" doctrine discussed in *Pearson* could be extended to cover her situation; after all, there is less reason to fear unconstitutional abuses of police power in situations like Fish's, where the police were accompanying a private citizen for the purpose of keeping the peace, than in situations like Callahan's, where the police were accompanying a private citizen for the purpose of bating and arresting the homeowner. It is certainly not "clearly established" that Riesco's permission to enter did not extend to the officers.

Second, even if the sunroom was not curtilage but rather a part of the house, the officers could have reasonably believed, at the time of their entry into the sunroom following in Riesco's footsteps, that their entry into the sunroom was constitutional. *See Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) ("[A] police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred.").

When they drove to the house, the officers were following Riesco, whom they knew was familiar with the house. She drove the officers straight to the back

of the house, where the only cars at the house were parked. She got out of her car, walked straight through the sunroom door without knocking or checking to see if it were locked (as though she expected it to be unlocked), and proceeded straight through to the back door and began knocking. In other words, the officers saw Riesco, who was not an occupant of the house, walk straight into the unlocked sunroom. The officers, under these circumstances, reasonably could have believed that the sunroom was "where the public would be expected to go" in order to get to the door of Fish's house and begin knocking in order to summon him. *Coffin v. Brandau*, 642 F.3d at 1012.

In the recent U.S. Supreme Court case of *Carroll v. Carman*, the Court found qualified immunity for officers in a somewhat analogous circumstance. *Carroll*, 135 S. Ct. 348 (2014). In *Carroll*, the officer walked through a sliding glass door that led to a ground-level deck that the officer believed "looked like a customary entryway." *Id.* at 349. The Court held that the officer was entitled to qualified immunity because, among other reasons, it was not clearly established that the officer could not enter the porch that he perceived to be a place where "visitors could be expected to go." *Id.* at 351 (finding that officer, under clearly established law, "may have concluded—quite reasonably—that he was allowed to knock on any door that was open to visitors."). Just as Officer Carroll was entitled to qualified immunity based on his reasonable belief that the enclosed porch was a

customary entryway, so too should Officers Harrison and Loucks based on their *actual perception* of the enclosed sunroom being used by Riesco as a customary entryway.

Furthermore, Officers Harrison and Loucks did not enter the sunroom until after Riesco had already walked all the way through the sunroom and begun knocking on the back door. (Video at 2:00). It was reasonable for them, as they watched Riesco knock on the back door, to believe that that door was a door that was "open to visitors." Officers are allowed to approach and knock on any door that was "open to visitors." *Carroll*, 135 S. Ct. at 351.

Officers Harrison and Loucks are therefore entitled to qualified immunity for their entry through the sunroom door.

### B. The Entry into the House

As discussed, contrary to Fish's arguments otherwise, it is indisputable that the officers received explicit permission to enter the back door of the home when Fish said "alright" after Riesco explained the officers' presence. As such, no constitutional violation occurred when the officers entered the back door.

Furthermore, again contrary to Fish's descriptions of the events, it appears that the officers had his permission to go to from the back door back towards the bedroom where the guns were in plain sight. As the officers entered the house and stepped into the kitchen, one of them asks Fish how he's doing, and he responds

16

that he's "good." (Video at 2:20; Doc. 48 at 12). Not ten seconds later, Officer

Harrison asked, "what all she got here?" and Fish responded "it's all in that

drawer, in there." (Video at 2:30). He was referring to the drawer in the bedroom.

(Doc. 48 at 12). About thirty seconds later, after further directing Riesco as to

where she could find her possessions, Officer Harrison asked Fish about the

injunction. (Video at 3:00). Fish responded "those aren't mine." (Video at 3:10).

Fish claims that, at that point, the officers were standing by the kitchen bar and

could only see into the bedroom. (Doc. 48 at 12). After that, Harrison entered the

bedroom and could see several guns in plain view.

It thus seems that from the point when the officers crossed through the door

to the point where they could see the guns from the kitchen, and even to the point

where they entered the bedroom and saw the guns, no constitutional violation

occurred. Fish had already given them explicit permission to enter the home by

saying "alright." As they entered, Fish responded to their greeting by saying "I'm

doing fine," and at no time made any objections whatsoever to their presence.[4] Fish

knew that their purpose was to accompany Riesco and observe her as she took her

items back, and despite this knowledge, Fish specifically directed Riesco to the

bedroom. Based on the audio evidence of the encounter, even taken in the light

---

[4] To be clear, failure to object does not imply consent. *United States v. Ramirez-Chilel*, 289 F.3d
744, 752 (11th Cir. 2002).

most favorable to him, Fish could not convince any reasonable juror that the officers at any point exceeded to the scope of the invitation that he had explicitly given them.

The officers correctly note that in *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002), the court found that officers had permission to enter a home where the plaintiff yielded the right of way to the officers who were not drawing their weapons or otherwise making any show of force. *Id.* at 751-52. Here, Fish gave even more explicit consent to the officers than did Ramirez-Chilel. Fish did more than simply yield the right of way to the officers; he said "alright" to their introduction, yielded the right-of-way,[5] responded to their greeting, and directed Riesco—whom the officers were accompanying and observing—to go into the bedroom. Furthermore, as in *Ramirez-Chilel*, the officers made no "show of official authority" that might have coerced Fish to consent; the officers were explicitly there only in a peacekeeping capacity and did not have their weapons drawn. *Id.* at 751. Officer Harrison even asked Fish how he was doing, to which Fish responded "I'm good."

---

[5] Fish must have yielded the right of way to the officers. When Fish opened the back door—wide enough for only one person—he saw Riesco and the officers waiting there. Unless the officers physically forced their way past him (they did not), or Fish inexplicably walked away from the door (he did not), then it seems apparent that Fish yielded the right of way to Riesco and the officers.

Fish's arguments that this case is analogous to *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323 (11th Cir. 2006) and *United States v. Gonzalez,* 71 F.3d 819 (11th Cir.1996), are undermined by the record. In both *Bashir* and *Gonzalez*, the plaintiffs never gave the officers express or implied consent to enter; they simply left the officers outside and retreated into their homes, and the officers followed. *Bashir*, 445 F.3d at 1329.  Here, by saying "alright" in response to Riesco's introduction of the officers, Fish—unlike Bashir or Gonzalez—gave the officers explicit permission to enter his home. Fish also gave implicit permission by yielding the right of way to the officers; this was fundamentally different from facts of *Bashir*, where the court specifically noted that it was influenced by the fact that the plaintiff did not yield the right-of-way. *Bashir,* 445 F.3d at 1329. Fish further gave the officers permission to delve further into his home into the bedroom when he directed Riesco, whom he knew was being watched and followed by the officers, to go to the bedroom to get her things from the drawer.

Furthermore, even if the officers were not actually invited into the home and entered and explored the home without Fish's permission, they would nevertheless be entitled to qualified immunity. For the reasons already described, a "reasonable police officer could have believed" under those circumstances that they had constitutionally valid permission to enter and go into the bedroom. *See Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000). Fish affirmed their presence, yielded

the right of way, and directed the person they were supposed to be protecting to go into the bedroom. Harrison and Loucks reasonably could have believed that they, in turn, had permission to accompany her inside the house and move towards the bedroom. They would thus be entitled to qualified immunity.

I find as a matter of law that the officers did not violate Fish's constitutional rights by entering his home and walking toward the bedroom, and even if they did, they are entitled to qualified immunity.

### 2.   *Probable Cause to Arrest*

Fish next argues that even if the officers were in his home legally, they did not have probable cause to arrest him. First, he argues that they could not see the guns from their vantage point in the kitchen. Second, he argues that they did not have sufficiently reliable information about the injunction to constitute probably cause to arrest him.

A warrantless arrest without probable cause violates the Constitution and is the basis for a § 1983 claim. *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990). Probable cause, however, is an absolute bar to a § 1983 claim for false arrest. *Id.* For probable cause to exist, the arrest must be objectively reasonable under the totality of the circumstances. *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1119 (11th Cir. 1992). An officer has probable cause to arrest "if the facts and circumstances within the officer's knowledge, of which he

or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). The existence of probable cause is a matter of law to be decided by the judge where the facts are not in dispute. *Marx*, 905 F.2d at 1506.

Intertwined with the question of probable cause is the issue of qualified immunity. *Von Stein*, 904 F.2d at 578. When assessing probable cause as part of a qualified immunity analysis, a lower standard—arguable probable cause—applies. *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1137 (11th Cir. 2007). Arguable probable cause asks whether a reasonable officer in the circumstances *could have believed* that probable cause existed. *Id.* This inquiry is another means of framing the "clearly established" prong of the qualified immunity test. *Poulakis v. Rogers*, 341 F. App'x 523, 526 (11th Cir. 2009).

### A.   The View of the Weapons

The "plain view" doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent. *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). If the officers knew of the injunction against Fish, and noticed readily-accessible guns in plain view in Fish's house in the

bedroom they believed to be his, then the guns would be incriminating and give rise to probable cause to arrest Fish.

Fish first argues that the officers could not have seen the guns in the bedroom from their vantage point in the kitchen, and raises concerns about discrepancies in the officers' reports and testimony about when they first noticed the weapons. He argues that therefore, because the weapons were not in plain view, the officers had no probable cause to arrest him.

However, Fish's argument fails for two reasons. First, as already determined, entry into the deep part of the kitchen (and even into the bedroom) would not have exceeded the scope of the permission that he gave the officers. As mentioned, Fish told Riesco—whom the officers were accompanying—to go into the bedroom to get her things out of the drawer there. Fish should have known that the officers might follow her into the bedroom, or at least come near to the bedroom to the point where they could see the guns inside. In any event, even if that would have exceeded the scope of their authority, the officers could have reasonably believed that they had such permission and were thus entitled to qualified immunity.

Second, even if the officers in fact could not see any weapons from where they were in the kitchen, Officer Harrison asked Fish explicitly if he still had the injunction against him prohibiting firearms. Fish immediately and defensively

responded "Those aren't mine!" (Video at 3:10). A reasonable officer could have interpreted this to be an admission both that there was, in fact, an injunction against Fish, and that there were guns in the immediate vicinity. Further, it is indisputable that less than five seconds later Officer Harrison had seen the guns in plain view, because he noted that "they out in the open." (Video at 3:13). If the guns were not in Harrison's plain view at the time he inquired about the injunction, they clearly were just seconds later. Even if in those few seconds Harrison stepped from the kitchen into the bedroom where he could see the guns, he did not exceed the scope of the consent that Fish had given him—or at least the scope of consent that he could have reasonably believed that Fish had given him.

Notably, Fish does not allege that Harrison ever touched or moved or searched through anything in order to see the guns. The facts are not in dispute that the guns were in plain view from *somewhere* in the home; exactly from where does not matter, because Harrison did not exceed the scope of his invitation by going to whatever point in the home it was from which he could see the guns.

By the time Officer Harrison told Fish that he was going to arrest him, Harrison had seen the guns and heard Fish admit that there was an injunction against him prohibiting firearm possession. It was clear at that point that Harrison could have reasonably believed that Fish was violating his injunction, and he had

probable cause to arrest him. Moreover, Harrison at least had the "arguable probable cause" that is sufficient to entitle him to qualified immunity.

### B.   *Reliability of Information about the Injunction*

Fish finally argues that the officers did not have probable cause to arrest him because they did not have sufficiently reliable information about the injunction that was, in fact, in effect against Fish. Viewing the facts in the light most favorable to the plaintiff, it appears that the officers only learned of the injunction against Fish by word-of-mouth from Riesco, and did not make any attempts to officially verify the status of the injunction. Still, Fish's argument fails for two reasons.

First, Fish does not point to any authority for the proposition that the word-of-mouth information about the injunction was insufficiently reliable to constitute probable cause to arrest. He furthermore does not point to any authority which requires officers to verify the existence of an injunction by some sort of official investigatory method before making an arrest based on the existence of the injunction. Fish's lack of citation to binding, or even non-binding, authority is especially problematic in the context of qualified immunity, as this seems to strongly indicate that the law did not put Officer Harrison "on notice that his conduct would be clearly unlawful." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).

Rather, the claim (which was in fact accurate) from Fish's ex-girlfriend that there was an injunction against Fish that prevented him from owning firearms could *arguably* be construed as "reasonably trustworthy information"—the basic requirement for probable cause—that there was such an injunction against Fish. *Von Stein*, 904 F.2d at 578. Courts have frequently found arguable probable cause when an officer relies on word-of-mouth information from a non-anonymous source when making an arrest. *See, e.g., Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998) ("[A]n officer is entitled to rely on a victim's criminal complaint as support for probable cause."); *Hendricks v. Sheriff, Collier Cnty., Florida*, 492 F. App'x 90, 93 (11th Cir. 2012) (finding arguable probable cause where officers relied on victims accusations, descriptions, and identifications); *Martin v. City of Panama City Beach, Fla.*, No. 5:13-CV-00367-RS-EMT, 2014 WL 4205682, at *4 (N.D. Fla. Aug. 25, 2014) (finding arguable probable cause to arrest where officer arrested man based solely on one man's accusation and with minimal corroboration of the accusation). In any event, the law appears sufficiently unsettled that Harrison was not put on notice that it was clearly unconstitutional for him to make an arrest based on the information about the injunction that Riesco gave him.

Additionally, once an officer raises the defense of qualified immunity, the plaintiff bears the burden to show that the officer is not entitled to it. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). By failing to provide any

authority in support of his claim that Officer Harrison's reliance on Riesco's information was constitutionally deficient, Fish has failed to meet his burden.

Second, even if the officers did not actually possess sufficiently reliable information about the status of the injunction, they nonetheless had probable cause to arrest him. And even if they did not have probable cause, they would at least be entitled to qualified immunity.

Harrison did not arrest Fish immediately upon seeing guns in the house, based on whatever information he had about the injunction. Rather, he specifically asked Fish if there was an injunction against him. Fish immediately and defensively responded "Those aren't mine!" (Video at 3:10). As mentioned, this response could be construed by a reasonable officer to be an admission that there was, in fact, an injunction against Fish prohibiting him from owning firearms. Fish did not deny the existence of an injunction, but denied that the guns belonged to him, lest he be arrested for violating the injunction. A reasonable person who did not have such an injunction against him would not have responded to the question the way that Fish did. Fish's response—a hasty denial of possession of the firearms—could, taken in conjunction with Riesco's allegations of the injunction, cause a reasonable officer under Harrison's circumstances to believe that Fish implicitly admitted that there was an injunction against him.

It thus seems that, based on Fish's perceived admission of the injunction against him, Harrison had actual probable cause to arrest Fish. Moreover, since a reasonable officer in Harrison's circumstances "could have believed that probable cause existed," *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1137 (11th Cir. 2007) (quotations omitted), to arrest Fish—that is, that there was an injunction against Fish prohibiting him from owning firearms—after hearing Fish's response to his inquiry, the officers are entitled to qualified immunity on the issue of probable cause.

I therefore find that the officers had probable cause to arrest Fish, and in any event, are entitled to qualified immunity.

### b.    *State Law Claims*

Jurisdiction of this case was predicated on Fish's § 1983 claims. Because both of those claims fail, I decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C § 1367(c)(3). Those claims are remanded back to the state court in which Fish originally filed.

### IV.   <u>CONCLUSION</u>

I therefore find that the officers are entitled to qualified immunity on all claims. The law is not clearly established that the officers violated Fish's constitutional rights by entering his sunroom, by going through his back door, by proceeding into his house where they saw the guns in his bedroom, or by arresting

him for possessing guns in violation of the injunction against him. In each instance, the officers could have reasonably believed, based on the circumstances of the events, that they were constitutionally authorized to enter the property, view the guns, and arrest Fish.

Therefore, the relief requested in the Motion for Summary Judgment of Defendants (Doc. 40) is **GRANTED.** Plaintiff's federal law claims are **DISMISSED WITH PREJUDICE.** Because the federal question claims are dismissed, I decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) over the remaining state law claims, which are **REMANDED** to state court. The Clerk is directed to close the case.


**ORDERED** on April 29, 2015.

**/s/ Richard Smoak**
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**